**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ROBIN DENISE PHILLIPS, as Administratrix of the ESTATE OF TAMARQUIS ASHANTI PHILLIPS,<br><br>    Plaintiff,<br><br>  v.<br><br>UMASS CORRECTIONAL HEALTH, UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL, JAMES C. HOLLAND, Complex Warden, FCC Butner, *in his individual capacity*, SARA M. REVELL, Warden, FCC Butner, *in her individual capacity*, JUSTIN F. ANDREWS, Warden, FCC Butner, *in his individual capacity*, STEPHANIE L. HOLLEMBAEK, Warden, FCC Butner, *in her individual capacity*, THOMAS B. SMITH, Warden, FCC Butner, *in his individual capacity*, DONNA M. SMITH, Warden, LSCI Butner, *in her individual capacity*, CYNTHIA SWAIN, Associate Warden, LSCI Butner, *in her individual capacity*, HENRY MCMILLAN, FCC Butner Health Services Administrator, *in his individual capacity*, SARA BEYER, Clinical Director of FCC Butner, *in her individual capacity*, IVY MANNING, Director of Nursing at FCC Butner, *in her individual capacity*, KELLIE HARDEN, Quality Manager at FCC Butner, *in her individual capacity*, GURINDER SANDHU, *in his individual capacity*, VANCEBORO INTERNAL MEDICINE, P.A., MICHAEL VAN SICKLE, *in his individual capacity*, TERI PERKINSON, *in her individual capacity*, AMY JO ROSENTHAL, *in her individual capacity*, ANDREW E. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     1:18CV974<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

STOCK, *in his individual capacity*,　　　)
MARY J. DENUZZIA, *in her individual*　　)
*capacity*, YVONNE LANE, *in her*　　　　)
*individual capacity*, CHRISTY BUNN,　　)
*in her individual capacity*, JOSEPH LEE　)
HACKETT, *in his individual capacity*,　　)
ALNISSA SHAW, *in her individual*　　　　)
*capacity*,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　　　)

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on various motions. Defendants Michael Van

Sickle [Doc. #24] and Henry McMillan, Ivy Manning, Kellie Harden, Christy Bunn,

and Alnissa Shaw [Doc. #64] move to dismiss pursuant to Rule 12(b)(1) for lack of

subject matter jurisdiction and/or Rule 12(b)(6) for failure to state a claim upon

which relief can be granted. Defendants James C. Holland, Sara M. Revell, Justin

F. Andrews, Stephanie L. Hollembaek, Thomas B. Smith, Donna M. Smith, Cynthia

Swain, Sara Beyer, Amy Jo Rosenthal, Andrew E. Stock, Mary J. DeNuzzia,

Yvonne Lane, and Joseph Lee Hackett [Doc. #66] and Terri Perkinson [Doc. #70]

move to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which

relief can be granted. Although not initially a party, the United States of America

moves to substitute [Doc. #29] and to dismiss for lack of subject matter

jurisdiction [Doc. #30]. Plaintiff Robin Denise Phillips moves to strike Defendants

Gurinder Sandhu's and Vanceboro Internal Medicine, P.A.'s motion to dismiss

included as part of their Answer. [Doc. #61.] For the reasons that follow,

Defendant Michael Van Sickle's Motion to Dismiss [Doc. #24] as converted to a

motion for summary judgment is GRANTED; Defendants Henry McMillan's, Ivy Manning's, Kellie Harden's, Christy Bunn's, and Alnissa Shaw's Motion to Dismiss [Doc. #64] as converted to a motion for summary judgment is GRANTED; Defendants James C. Holland's, Sara M. Revell's, Justin F. Andrews', Stephanie L. Hollembaek's, Thomas B. Smith's, Donna M. Smith's, Cynthia Swain's, Sara Beyer's, Amy Jo Rosenthal's, Andrew E. Stock's, Mary J. DeNuzzia's, Yvonne Lane's, and Joseph Lee Hackett's Motion to Dismiss [Doc. #66] is GRANTED IN PART WITHOUT PREJUDICE as to Holland, Revell, Andrews, Hollembaek, Thomas Smith, Donna Smith, Swain, Beyer, Rosenthal, Stock, DeNuzzia, and Hackett and is DENIED IN PART as to Lane; Defendant Terri Perkinson's Motion to Dismiss [Doc. #70] is GRANTED WITHOUT PREJUDICE; The United States of America's Motion to Substitute [Doc. #29] and Motion to Dismiss [Doc. #30] are DENIED AS MOOT; and Plaintiff Robin Denise Phillips's Motion to Strike Portions of Defendants Sandhu and Vanceboro's Answer [Doc. #61] is DENIED AS MOOT.

I.

Except as noted in § II.A., the following factual allegations in the Amended Complaint are accepted as true for purposes of the pending motions to dismiss. On May 20, 2017, thirty-eight-year-old Tamarquis Ashanti Phillips died while in the custody of the Bureau of Prisons. (E.g., Am. Compl. ¶ 1 [Doc. #9].) Years earlier, after a car accident in September 2012, he began suffering from a severe seizure disorder for which he regularly saw a neurologist. (Id. ¶¶ 40, 43.) As of October 2016, he was prescribed three Anti-Epileptic Drugs that he took properly and

regularly – (1) Depakote, 500mg, delayed release, two tablets twice a day, (2) Keppra, 500mg, one tablet twice a day, and (3) Vimpat, 150mg, two tablets twice a day. (Id. ¶¶ 43, 44.)  Without these medications, Phillips was at a very high risk for seizures and death. (Id. ¶ 45.)  Even abruptly stopping any one of these medications posed a danger. (Id.)  Depakote's label warned: "Do not stop taking Depakote without first talking to your healthcare provider.  Stopping Depakote suddenly can cause serious problems." (Id.)  Vimpat's warning label states the same and further explains, "Stopping seizure medicine suddenly in a patient who has epilepsy can cause seizures that will not stop (status epilepticus)." (Id.)  Keppra's label instructs, "Antiepileptic drugs, including KEPPRA, should be withdrawn gradually to minimize the potential of increased seizure frequently." (Id.)

After pleading guilty in April 2017 in the Western District of North Carolina to a drug offense, Phillips was sentenced to a term of imprisonment of 144 months in the Bureau of Prisons ("BOP"). (Id. ¶ 46.)  Among the sentencing judge's recommendations to the BOP was the recommendation that Phillips be "'placed in a facility as close to Charlotte, NC, as possible, capable of providing him necessary medical treatment required by his medical condition and indicated seizure issues, consistent with the needs of the BOP.'" (Id. ¶ 48.)  As of the time of his incarceration, because of his proper and regular use of Depakote, Keppra, and Vimpat, Phillips had not suffered a seizure in over a year. (Id. ¶ 43.)

After his sentencing, Phillips was temporarily incarcerated at the Mecklenburg County Jail until he was transferred to the Low Security Correctional

Institute ("LSCI Butner") at the Federal Correctional Complex in Butner, North Carolina ("FCC Butner"). (Id. ¶¶ 49, 52, 53.)  During his incarceration at the Mecklenburg County Jail, Phillips was administered all three of his medications regularly, and the medication orders record was provided to FCC Butner. (Id. ¶ 52.)

"FCC Butner provides in-house, on-site medical coverage and nurse staffing twenty-four hours [a] day, seven days a week." (Id. ¶ 49.)  Phillips entered LSCI Butner at 3:41 p.m. on May 16, 2017 at which time Perkinson, an Emergency Medical Technician and Paramedic, performed a health screen. (Id. ¶¶ 53, 54.)  She "noted a history of generalized absence seizures, greater than one per year, with adult onset", "his last seizure had been seven to twelve months before", and his "seizures had begun seven months after a car accident", but she did not note that Phillips was taking medications for those seizures. (Id. ¶¶ 53, 54.)  He was given a PPD test to screen for tuberculosis and was issued his eyeglasses later that afternoon. (Id. ¶ 55.)  The "screening tool indicated, 'Instructed inmate how to obtain medical, dental and mental health care.'" (Id.)  Phillips was scheduled to have a medication reconciliation at 3:50 p.m. by a physician, "presumably" Sandhu or Rosenthal", but that never occurred. (Id. ¶ 56.)

At 3:25 p.m. the following day, May 17, Van Sickle, a Board Certified Adult Nurse Practitioner, met with Phillips and filled out a Health Problems form "indicating an ICD-10 code of 'G40909 – Epilepsy Seizure Disorder,' a diagnosis that was current." (Id. ¶ 58.)  Van Sickle wrote a new prescription for generic Depakote, Divalproex ER, "24-hour tab 500mg, take two tablets, 1000mg by

mouth twice daily for seizures to start that day." (Id. ¶ 59.) However, Van Sickle never added the prescription to Phillips's Medication Administration Record ("MAR"), the prescription was never filled or dispensed, and Van Sickle neither prescribed Keppra nor Vimpat nor documented any basis for this decision. (Id. ¶¶ 59, 60, 61.)

At 6:46 a.m. on May 18, DeNuzzia, a Registered Nurse, read Phillips's PPD test, at which time, upon Plaintiff's information and belief, Phillips requested his medication but did not receive it. (Id. ¶ 62.) Although there is a notation on May 18 that Phillips was to receive Divalproex ER 24-hour Tab 500 mg, Lane, a Registered Nurse and the pharmacy provider, did not issue the medication to Phillips and there is no record why the prescribed medication was not dispensed. (Id. ¶ 63.) Yet, "the national formulary for the [BOP] provides the following notation for Divalproex: 'Warning, designated high risk Medication! Ensure appropriate medication, frequency, indication and monitoring.'" (Id.)

On May 19, a friend and fellow inmate of Phillips told Phillips's fiancée that the two of them had gone to medical staff to request Phillips's medications. (Id. ¶ 65.) Another inmate stated that Phillips was visibly and severely shaking and informed the staff at LSCI Butner that he was not feeling well.[1] (Id. ¶ 66.) Just before 11:00 p.m., Phillips told his fiancée that he was very concerned about his

---

[1] It is unclear who informed the staff – Phillips or his fellow inmate.

health because the medical staff would not give him his medications despite his repeated requests. (Id. ¶ 68.)

Around 1:00 a.m. on May 20, Phillips was seen going to the bathroom. (Id. ¶ 69.) He was not seen alive again. (Id.) At 9:58 a.m., he was discovered face down, unresponsive, pulseless, and cold, with locked muscles and blood on his pillow. (Id. ¶ 70.) Perkinson, Bunn, and Hackett initiated CPR, but were unsuccessful at resuscitating Phillips. (Id.) Within thirty minutes, Phillips was declared dead by Sandhu, the responding hospitalist. (Id. ¶ 72.) An autopsy concluded his cause of death was a seizure disorder. (Id. ¶ 74.)

At no time during his incarceration at LCSI Butner did Phillips see a physician, including his assigned hospitalist Sandhu or his attending doctor Rosenthal, who indicated on the Multi-Level Mortality Review ("MLMR") that she had never seen Phillips and was not notified of his presence at the facility. (Id. ¶ 71.) Furthermore, although Phillips's MAR began on May 16, it is completely blank and contains no indication that Phillips was ever given any medication while at LSCI Butner. (Id. ¶ 56.)

The Medical Examiner was "apparently told" that Phillips "'was prescribed Depakote, Vimpat, and Keppra while in prison for his seizure disorder'" and that he "'reportedly missed all three medications on 5/19/17.'" (Id. ¶ 75.) Yet, the "MAR contains no indication that Mr. Phillips was offered these medications and either failed to appear to receive them or refused them" and "any such refusal . . . should have been documented in his medical records, as required by the standard of care

7

and FCC Butner's own policies." (Id. ¶ 76.)  Postmortem toxicological analysis

detected a subtherapeutic level of Lacosamide (Vimpat) and no Divalproex

(Depakote) or Levetiracetam (Keppra) on acidic, neutral, and basis screens. (Id.

¶ 77.)

Nearly a month after Phillips died, Perkinson wrote a memorandum dated

June 17 in which she stated that she performed Phillips's intake screen on May 16

and that he brought his medication with him, but she could not give him the

medications "for self carry". (Id. ¶ 79.)  Because it was after 4:00 p.m. and staff

had left for the day, she placed the medication and paperwork in the medication

distribution room so he "'could receive his evening and morning dosage until his

provider was available to complete his medication reconciliation the next

morning'". (Id.)  Although she stated that she noted this in the 24-hour report and

sent the intake to the provider for signature, the note is nowhere in the records.

(Id.)  She also wrote that Phillips came to the pill line that night and she

administered his evening dosages, but there is no record in any contemporaneous

document that he received his medication. (Id. ¶ 80.)  Such a record is required for

a Schedule V controlled substance like Vimpat because it requires an accounting of

distribution. (Id.)

On June 28, Donna Smith, warden of LSCI Butner, submitted a Multi-Level

Mortality Review ("MLMR") to the Office of Quality Management that reflected

Phillips's admitting diagnosis of Epilepsy/Seizure Disorder, described his death as

natural, and indicated that he underwent medication reconciliation with Divalproex

500mg having been prescribed twice a day for his seizure disorder. (Id. ¶¶ 18, 81, 82.)  The MLMR does not state that Phillips was actually given his medication while at LSCI Butner nor does it explain why his other two medications were discontinued. (Id. ¶ 82.)  In addition, the MLMR notes that Phillips was scheduled for a history and physical for May 24, eight days after his arrival. (Id. ¶ 85.) Swain (Associate Warden of FCC Butner), Beyer (Medical Doctor and Clinical Director of LSCI Butner), McMillan (Health Services Administrator at FCC Butner), Harden (Registered Nurse and Quality Manager at FCC Butner), Manning (Registered Nurse and Director of Nursing at FCC Butner), Shaw (Certified Physician's Assistant and Reviewing Clinician), and Rosenthal, signed the MLMR. (Id. ¶¶ 19, 21-24, 36, 83.)

Plaintiff filed the instant action alleging negligence (Count I), wrongful death (Count II), corporate negligence (Count III), deliberate indifference to serious medical needs in violation of 42 U.S.C. § 1983[2] (Count IV), and gross negligence (Count V). (See generally Am. Compl.)  After the United States of America submitted the Certification of the United States Attorney for the Middle District of North Carolina in which he attested that all of the individual defendants (except Sandhu) (the "Federal Defendants") "were acting in their official capacity within the scope of their employment as employees of the United States at the time of the conduct alleged in the Complaint", Plaintiff voluntarily dismissed Counts I, II,

---

[2] Plaintiff has since acknowledged that she "mistakenly labeled Count IV" which "should have been labeled as a Bivens action", [Doc. #59 at 3 n.1].

and V of her Amended Complaint against the Federal Defendants. (Certification of Matthew G.T. Martin (Apr. 10, 2019) [Doc. #29-1]); Pl.'s Notice of Voluntary Dismissal of Counts I, II, and V at 1-2 [Doc. #58].)  Accordingly, the United States of America's Motion to Substitute and Motion to Dismiss for Lack of Submit Matter Jurisdiction are denied as moot.

## II.

The Federal Defendants challenge the sole claim remaining against them – a Bivens action alleging deliberate indifference to Phillips's serious medical needs in violation of the Eighth Amendment.

## A.

Van Sickle, McMillan, Manning, Harden, Bunn, and Shaw ("PHS Defendants" or "Defendants" for purposes of this section) move to dismiss Plaintiff's deliberate indifference claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  They have attached their declarations in which each avers to have been a United States Public Health Service ("PHS") officer during Phillips's incarceration at LSCI Butner. [Docs. #24-1, 64-1, 64-2, 64-3, 64-4, 64-5.] Relying on this fact and others, they argue they are immune under 42 U.S.C. § 233(a) from Plaintiff's deliberate indifference claim. (E.g., Am. Mem. in Supp. of Mot. to Dismiss [Doc. #32], Public Health Serv. Defs. McMillan, Manning, Harden, Bunn and Shaw's Mem. in Supp. of Mot. to Dismiss [Doc. #65].)

While these PHS Defendants have moved to dismiss, on the one hand, pursuant to Rule 12(b)(1), they cite no law in support of analyzing their motions as

challenges to this Court's subject matter jurisdiction over Plaintiff's <u>Bivens</u> action against them. Plaintiff appears to assume a subject matter jurisdiction challenge is appropriate because she addresses which party bears the burden on such a motion.[3] (Pl.'s Opp'n to Def. Michael Van Sickle's Mot. to Dismiss ("Pl.'s Opp'n to Van Sickle") at 4-5 [Doc. #59], Pl.'s Opp'n to Mot. to Dismiss of Defs. McMillan, Manning, Harden, Bunn and Shaw ("Pl.'s Opp'n to Defs.") at 4-5 [Doc. #74].) Accordingly, neither the PHS Defendants nor Plaintiff addresses the consequence of the Court's consideration of Defendants' declarations if their motions are analyzed pursuant to Rule 12(b)(6), on the other hand.

It is determined that Defendants' claims of immunity as PHS officers are not subject matter jurisdiction challenges. Instead, their argument is understood to be that because they are immune, Plaintiff has failed to state a claim against them for which relief can be granted. However, to support this argument, Defendants must rely on information in their declarations. When "matters outside the pleadings are presented to and not excluded by the court [on a motion under Rule 12(b)(6)], the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[3] Both Plaintiff's argument and the cases she cites actually involve Eleventh Amendment immunity, but these Defendants are federal employees asserting immunity as PHS officers.

matter of law." Fed. R. Civ. P. 56(a). "As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Carter v. Lassiter, No. 1:18-CV-275-FDW, 2019 WL 6048043, at *4 (W.D.N.C. Nov. 14, 2019). The court views the evidence and inferences in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48. A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id. The court cannot weigh the evidence, by failing to credit contradictory evidence, or make credibility determinations. Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651 (4th Cir. 2018).

When a motion filed under Rule 12(b)(6) is converted to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the materials that is pertinent to the motion." Fed. R. Civ. P. 12(d). Although Plaintiff did not contest the fact as stated in Defendants' declarations that they were PHS officers at the times relevant to the Amended Complaint, she was afforded an opportunity to provide or point out facts that create material disputes from sources

12

that may be considered in determining a motion for summary judgment. (Order [Doc. #82].) Plaintiff responded in agreement that Defendants' submission of their declarations converted their motions to summary judgment. (Pl.'s Notice at 1 [Doc. #83].) However, "she does not currently have information that creates any material factual dispute". (Id.) She requests that Defendants' motions be denied "as premature, and without prejudice to reallege the arguments after discovery has been conducted in this matter." (Id. at 2.)

When "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. 56(d) Civ. P. Here, Plaintiff admits that she has no facts to create a genuine dispute of material fact as to the PHS Defendants' immunity. Although she requests that their motions be denied until discovery has been conducted, she does not request immediate discovery on this discrete issue, nor is it apparent what facts she could present that would create a genuine dispute of material fact on this narrow issue. Defendants have proffered declarations under penalty of perjury attesting that they were PHS officers at the time of Phillips's incarceration and their actions with respect to Phillips were taken within the scope of their duties as PHS officers. Furthermore, as explained below, all of their alleged conduct with respect to Phillips was medically related. Accordingly, under these circumstances, it is appropriate to address Defendants' motions and grant them immunity.

Title 42 U.S.C. § 233(a) "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all claims against them for such conduct." Hui v. Castaneda, 559 U.S. 799, 806 (2010) (barring Bivens action against PHS officers and employees).

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). "By its terms, § 233(a) limits recovery for such conduct to suits against the United States." Hui, 559 U.S. at 806.

Here, there is no dispute that the PHS Defendants were, at all times relevant to the Amended Complaint, officers of the Public Health Service acting within the scope of their offices or employment. Plaintiff instead (1) challenges the constitutionality of § 233(a) and (2) argues that the PHS Defendants' conduct falls outside of that protected by the statute. First, Plaintiff argues that § 233(a) unconstitutionally denies her due process and equal protection, the right to open courts, and the right to a jury trial because its "practical impact" is to leave her without a remedy. (E.g., Pl.'s Opp'n to Van Sickle at 6-9.) This is purportedly so because "the United States commonly asserts that it is entitled to the

14

'discretionary function' exclusion for conduct of a medical professional in the administration of medical care." (Id. at 6-7.)  As the Supreme Court stated in Hui, the remedy for medically related tortious conduct by PHS officers is suit against the United States.  Furthermore, she cites no case law to support her position that § 233(a) unconstitutionally leaves her without a remedy.  Respondents' amici in Hui "caution[ed] that providing special immunity for PHS personnel [was] contrary to the public interest", but the Court steadfastly interpreted the statute according to its text to find that it "plainly precludes Bivens actions". 559 U.S. at 812-13. Furthermore, the Second Circuit Court of Appeals explained that § 233(a) does not "deprive [a plaintiff] of her constitutional due-process rights." Cuoco v. Moritsugu, 222 F.3d 99, 108 (2000).  Instead, § 233(a) reflects that "[t]he United States . . . in effect insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties." Id.

The Hui Court has also disposed of Plaintiff's other bases for her contention that she will be left with no remedy. See Hui, 559 U.S. at 806-07 (explaining that its "reading of § 233(a)'s text is not undermined by the fact that the provision preceded" Bivens), 807-08 (noting that the Carlson Court did not address the question of official immunity).

Plaintiff also argues that § 233(a) is unconstitutional because the U.S. District Court for the Northern District of Texas declared the Affordable Care Act ("ACA") unconstitutional, which necessarily included § 233(a). (E.g., Pl.'s Opp'n to

Van Sickle at 9-10.)  The Fifth Circuit Court of Appeals recently affirmed in part

and vacated in part the district court's opinion, remanding

> to explain with more precision what provisions of the post-2017 ACA
> are indeed severable from the individual mandate, and to consider the
> federal defendants' newly-suggested relief of enjoining the
> enforcement only of those provisions that injure the plaintiffs or
> declaring the Act unconstitutional only as to the plaintiff states and
> the two individual plaintiffs.

Texas v. United States, ___ F.3d ___, 2019 WL 6888446, at *21 (Dec. 18, 2019).

However, neither court's decision is of precedential value to this court, and as the

PHS Defendants note, "[w]hen Congress enacted the Affordable Care Act in 2010,

no amendments or additions were made to § 233(a)" while the "only change to 42

U.S.C. § 233 by the Affordable Care Act was to amend § 233(o)(1), which is not

germane to this case". (E.g., Reply to Pl.'s Opp'n to Mot. to Dismiss at 4 [Doc.

#60].)  There is no basis on which to find § 233(a) unconstitutional.

Plaintiff next contends that the PHS Defendants' conduct is not the conduct

that § 233(a) protects – "the performance of medical, surgical, dental, or related

functions".  She argues that each of the PHS Defendants' "role[s]" "was purely

administrative and ministerial" and, as such, "do[es] not constitute 'medical care'

and, therefore, fall[s] outside the scope of immunity afforded by § 233(a)." (Pl.'s

Opp'n to Van Sickle at 11-12; Pl.'s Opp'n to Defs. at 11.)  She contends that Van

Sickle's role was ministerial because, according to his Declaration, he did not

personally meet Phillips or have any interaction with him and stated he acted

according to protocol. (Pl.'s Opp'n to Van Sickle at 11.)  Similarly, Plaintiff argues

that because Harden, McMillan, Manning, and Shaw provided no medical care to Phillips and Bunn only did so after Phillips coded, their actions were ministerial. (Pl.'s Opp'n to Defs. at 11.) She contends their "intentionally ignoring Mr. Phillips's condition and failing to administer medication [] do not constitute 'medical care' and, therefore, fall outside the scope of immunity afforded by § 233(a)." (Id.)

Although courts do recognize a difference between discretionary and non-discretionary acts in other contexts, none of the cases Plaintiff cites in support of her argument concerned PHS officers or employees or 42 U.S.C. § 233(a). Instead, the cases applying § 233(a) to the actions of PHS officers and employees look strictly at whether the conduct involved "the performance of medical, surgical, dental, or related functions." See, e.g., Cuoco, 222 F.3d at 108-09 (contrasting "an allegation of intentional discrimination on the basis of race and sex by a supervisor against an employee during a professional peer review process" that has "nothing to do with the 'performance of medical . . . or related functions" with actions of immune PHS officials whose challenged medically-related conduct either took place in the course of rendering medical treatment to Cuoco or "related only to [the] decision[] [by] the principal medical official for the Bureau of Prisons[] not to authorize a particular medical treatment for Cuoco"); Moses v. Stewart, No. TDC-15-3875, 2017 WL 4326008, at *2, *4 (D. Md. Sept. 26, 2017) (finding a PHS employee immune who served as the Health Services Administrator and was alleged to have told Moses that a request for surgical consultation was pending

before the prison Utilization Review Committee); <u>Marshall v. Stewart</u>, No. TDC-16-1645, 2017 WL 3671160, at *3, *4 (D. Md. Aug. 23, 2017) (finding a PHS employee immune who served as the Health Services Administrator and was alleged to have denied Marshall's request for a transfer to a medical facility because he had been receiving appropriate care); <u>De La Cruz-Garcia v. Lucas</u>, No. 1:16-05733, 2016 WL 11268303, at *4-*5 (S.D.W. Va. Nov. 15, 2016), <u>adopted</u> 2017 WL 944221 (finding a PHS employee immune who served as the Health Services Administrator whose alleged role "was to administer and supervise the prescribed treatment plan prescribed by the outside orthopedic surgeon").

Plaintiff's allegations about these PHS Defendants and their own Declarations clearly support a finding that their challenged conduct was medically-related. Van Sickle's allegedly tortious conduct was prescribing only one of Phillips's anti-seizure medications, failing to ensure the prescription made it into Phillips's MAR, and discontinuing his other anti-seizure medications without examining Phillips or documenting a basis for doing so – conduct which is obviously medically-related. (<u>See</u> Am. Compl. ¶¶ 58-60; Decl. of Michael Van Sickle ¶ 4 (May 22, 2019).)

Bunn, the Assistant Health Services Administrator and Institutional Duty Officer, responded to the medical emergency when Phillips was found unresponsive and performed CPR. (<u>See</u> Am. Compl. ¶ 70; Decl. of Christy Bunn ¶¶ 1, 2 (June 25, 2019).) McMillan, Manning, Harden, and Shaw provided no direct patient care to Phillips but were involved with his mortality review. (<u>See</u> Am.

18

Compl. ¶¶ 22, 23, 24, 83; Decl. of Henry McMillan ¶¶ 4, 5 (June 24, 2019);

Decl. of Ivy Manning ¶¶ 3, 4 (June 17, 2019); Decl. of Kellie Harden ¶ 2 (June

27, 2019); Decl. of Alnissa Shaw ¶ 2 (June 18, 2019).)  To the extent any of

Bunn's, McMillan's, Manning's, Harden's, or Shaw's aforementioned conduct is

alleged to have injured Phillips, which it does not appear to be so alleged, their

conduct was medically-related.  Furthermore, even assuming Plaintiff's allegations

of supervisory liability or policy-based liability against McMillan, Manning, and

Harden were sufficiently alleged, see, e.g., Slakan v. Porter, 737 F.2d 368, 373

(4th Cir. 1984) (explaining supervisor and policy-making liability for constitutional

violations), such conduct would necessarily be medically-related.  Therefore,

because Van Sickle, McMillan, Manning, Harden, Bunn, and Shaw were PHS

officers at the times relevant to Plaintiff's Amended Complaint and their allegedly

deficient conduct was within the scope of their official duties and medically-

related, 42 U.S.C. § 233(a) bars the Bivens action against them.

B.

Holland, Revell, Andrews, Hollembaek, Thomas Smith, Donna Smith, Swain,

Beyer, Rosenthal, Stock, DeNuzzia, Lane, and Hackett (referred to collectively as

"Defendants" for purposes of this section) move to dismiss Plaintiff's deliberate

indifference claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

They argue that because Plaintiff has failed to allege sufficiently a constitutional

violation, they are entitled to qualified immunity. (Mem. of Law in Supp. of Mot. to

Dismiss at 5-6 [Doc. #67].)  More specifically, they contend that Plaintiff's

19

allegations of failure to supervise and failure to train against Holland, Revell, Andrews, Hollembaek, Thomas Smith, Donna Smith, Beyer, Swain, and Stock must be dismissed because "a civil rights action brought under Bivens is a direct liability claim" and "may not be grounded upon a respondeat superior theory" and that Plaintiff otherwise has failed to state a claim that any of Defendants were deliberately indifferent to Phillips's serious medical needs. (Mot. to Dismiss at 1-2.)

Qualified immunity "shield[s] from liability [government officials performing discretionary functions] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "[W]hen the defendant . . . raises a qualified immunity defense, the court ordinarily assesses whether the plaintiff's complaint states sufficient factual allegations that, if true, show a violation of clearly established constitutional rights." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). "[T]he plaintiff's complaint must allege conduct a reasonable [prison official] would know to be unlawful." Id. "'Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" Id. at 330 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).  When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557.  In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

"It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the

Eighth Amendment.'" Gordon v. Schilling[4], 937 F.3d 348, 356 (4th Cir. 2019)

(citing Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (citing Estelle v.

Gamble, 429 U.S. 97, 104 (1976))). To state a claim under the Eighth

Amendment, a prisoner must allege that "the deprivation suffered or injury inflicted

on [him] was sufficiently serious" and that "the prison official acted with a

sufficiently culpable state of mind". Smith v. Smith, 589 F.3d 736, 738 (4th Cir.

2009) (quoting Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008)).

First, a sufficiently serious medical need is one that has "'been diagnosed by

a physician as mandating treatment or is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention.'" Gordon, 937 F.3d at 356

(quoting Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) but omitting

alterations and internal quotation marks).

Second, a prison official acts with a sufficiently culpable state of mind when

he acts with deliberate indifference. Scinto, 841 F.3d at 225. "Deliberate

indifference is a very high standard". Parrish ex rel. Lee v. Cleveland, 372 F.3d

294, 302 (4th Cir. 2004). It "entails something more than mere negligence", but

"is satisfied by something less than acts or omissions for the very purpose of

causing harm or with knowledge that harm will result." Farmer v. Brennan, 511

---

[4] Gordon, along with several other cases cited in this Opinion, involve claims
against state prison officials pursuant to 42 U.S.C. § 1983. The Supreme Court
has described a Bivens action as the "federal analog to suits brought against state
officials under Rev. Stat. § 1979, 42 U.S.C. § 1983." Iqbal, 556 U.S. at 675-76
(quoting Hartman v. Moore, 547 U.S. 250, 254, n.2 (2006)).

U.S. 825, 835 (1994). The prison official must have "'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.'" Scinto, 841 F.3d at 226 (quoting Jackson, 775 F.3d at 178); see also Iko, 535 F.3d at 241 (requiring that the official have "actual knowledge of the risk of harm to the inmate" and "recogni[tion] that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs"). The official needs to be aware of more than the general risks associated with his conduct. Parrish, 372 F.3d at 304-05. He must recognize the incremental risk to the prisoner that his conduct creates. Id. at 304-05.

Furthermore, "it is not enough that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient." Id. at 303; see also Farmer, 511 U.S. at 843 n.8 ("It is not enough merely to find that a reasonable person would have known, or that the defendant should have known" of the risk.). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837. Therefore, Eighth Amendment liability will not lie where "a prison official . . . was unaware of a substantial risk of harm to an inmate . . . [that] was obvious and a reasonable prison official would have noticed it." Id. at 841-42 (refusing to adopt the objective standard from Canton v. Harris, 489 U.S. 378 (1989) for use in cases alleging prison officials are liable for Eight Amendment violations). However,

23

when "a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it", it could be said that the prison official had actual knowledge of the risk. Id. at 842-43; see also id. at 843 n.8 (noting that a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

1.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Iqbal, 556 U.S. at 676. However, a supervisor may be liable for his own conduct, such as under circumstances when "prisoners face a pervasive and unreasonable risk of harm from some specified source" and "the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Slakan, 737 F.2d at 373 (quoting Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir. 1980)). However, "a single incident or isolated incidents" is not sufficient because "a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities[,] [n]or can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate misconduct." Id. "A supervisor's continued inaction in the face of documented widespread abuses,

24

however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id.

A supervisor's failure to train constitutes deliberate indifference if

(1) the subordinates actually violated the [prisoner's] constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the [prisoner's] rights.

Brown v. Mitchell, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004). As above, though, even if the subordinate violated the prisoner's constitutional rights, the supervisor "must have had notice of the constitutional . . . violation, and thereafter must have consciously chosen a particular course of action in response." Id. at 703. "It is generally acknowledged that, if the supervisory power is actually aware of the fact that its subordinates are regularly violating constitutional . . . rights, and the supervisory power fails to implement a training program to quell this pattern, deliberate indifference exists." Id.

Plaintiff alleges that Holland (Complex Warden of FCC Butner), Revell, Andrews, Hollembaek, and Thomas Smith (all Wardens of FCC Butner), Donna Smith (Warden of LSCI Butner), and Swain (Associate Warden of FCC Butner) (collectively "Warden Defendants"), "are responsible for the day-to-day operations of FCC and LSCI Butner" and "make the policies and practices of the BOP, FCC Butner and LSCI Butner regarding medical treatment of inmates and, more

specifically, the administration of care and medication to inmates with known, serious medical needs." (Am. Compl. ¶¶ 13-20.)  FCC Butner policies required "physician coverage . . . by a hospitalist whenever staff physicians are not on-site," evaluation of inmates "for serious medical conditions as needed", "medical screening . . . to be 'conducted promptly on all new arrivals'" to include "medical staff interview and visual assessment to identify any 'acute or chronic medical problems and trauma'" and completion of a "medication reconciliation form". (Id. ¶¶ 49, 50.)  In addition, Holland, Andrews, Hollembaek, and Thomas Smith created the "Complex Supplement" "'to establish the procedures by which inmates may obtain medical or dental treatments with a minimum of time lost from their jobs, and simultaneously provide security safeguards and effective treatment'" including "an interview by medical staff, assessment for chronic medical problems and a medication reconciliation" to "'be conducted promptly on all new arrivals'". (Id. ¶ 91.)  General population inmates "'without immediate medical needs" were to "be scheduled for physical exam within 14 days of arrival", but no deadline is specified for those with immediate medical needs. (Id. ¶ 92.)

The Warden Defendants and Beyer, the Clinical Director of LSCI Butner, are alleged to be among the Policymaking Defendants. (Id. ¶ 57.)  They allegedly "wholly failed to create a system or method by which . . . high-risk inmates were treated on admission to the facility." (Id. ¶ 67.)  They also failed

> to ensure that proper controls and/or protocols were in place to document and reconcile necessary medications, ensure the prompt medical assessment for serious medical conditions upon admission to

> FCC Butner, administer critical medications to inmates, monitor inmates with serious medical needs and provide inmates with appropriate treatment for medical conditions while housed at the FCC Butner.

(Id. ¶ 118; see also ¶¶ 84, 89.)

The Policymaking Defendants are also alleged to have provided no training to Perkinson who "did nothing to flag or otherwise elevate Mr. Phillips's medical care for his serious condition." (Id. ¶ 57.)  Furthermore, their training of medical staff more broadly at LSCI Butner "was woefully inadequate." (Id. ¶ 87.)

> These failures to train include, but are not limited to: (1) appropriate identification of serious medical needs upon intake; (2) prompt, full examination of inmates with serious medical needs; (3) proper reconciliation of medications; (4) determination of when and how to elevate an inmate's medical needs to a physician; (5) responsiveness to requests for medication by an inmate; and (6) documentation of essential medical information, such as prescriptions, medication administration, and medical conditions.

(Id.)  In addition to the Policymaking Defendants, Stock, the medical doctor who supervises Van Sickle, allegedly failed to oversee and train Van Sickle with respect to, among other things, "his administration of medication." (Id. ¶ 61.)

The Policymaking Defendants argue that these allegations are insufficient to "support a policy-based deliberate indifference claim." (Mem. in Supp. of Mot. to Dismiss at 8.)  They contend that Plaintiff did not identify specific policies that were inadequate, did not plead that each of these Defendants "individually knew that the facility lacked adequate policies or that the existing policies caused serious injuries or the denial of medical care", and, despite generally alleging that "'this

conduct is widespread'", did not allege how each of these Defendants would have been on notice of the inadequacy of the policies. (Id. (quoting Am. Compl. ¶ 127).)

Together with Stock they contend that Plaintiff's allegations of failure to supervise and to train also fall short. Stock is not alleged to have known anything about Van Sickle's conduct, and Beyer is not alleged to have known anything about Phillips. (Id. at 15, 16.) There are no allegations of the Wardens' specific assignments or times of service to show they were responsible for training Perkinson, and there is no allegation that any of them had any knowledge of her care of Phillips. (Id. 16-17.)

Plaintiff responds that she has sufficiently stated a claim against these Defendants.[5] She argues that the policies of the Policymaking Defendants have "gaping deficiencies" that put them on notice and cites Canton v. Harris, 489 U.S. 378, 288 (1989), for the proposition that "a defendant may . . . be on notice where a policy deficiency is so glaring that it puts any reasonable person on notice of the need for better policies and training." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 17-18 (citing Am. Compl. ¶ 118).)[6] She also contends that she "specifically

_____

[5] Plaintiff cites Bowens v. Cannon, 175 F. App'x 635, 636 (4th Cir. 2006), as an example of a sufficiently pled claim of deliberate indifference to serious medical needs. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 6 [Doc. #75].) Not only do those facts allege failings of medical providers, not supervisors, but the court used the "[now-]retired" "'no-set-of-facts'" pleading standard from Conley v. Gibson, 355 U.S. 41 (1957), Iqbal, 556 U.S. at 670.
[6] As part of her argument, though, she also relies on facts not alleged in her Amended Complaint, including Defendants' awareness of Joint Commission policies and standards. (Id. at 18-19.)

pled that the Warden Defendants wholly failed to train and supervise their medical staff to handle the care of inmates with serious needs". (Id. at 19.)[7]

Plaintiff contends that North Carolina statutes provide "an independent onus on supervising physicians [like Stock] pursuant to licensure requirements" that distinguishes her allegations against Stock from those sounding in respondeat superior liability. (Id. at 13, 13 n.1.)  These statutes authorize nurse practitioners like Van Sickle to prescribe medications where supervising physicians have provided written instructions about doing so and have provided a written policy for periodic review of the drugs prescribed. (Id. at 13-14 (citing N.C. Gen. Stat. §§ 90-18.2(b)(4), 90-18.2(d)(3), 90-18.2(e)).)  Those statutes deem the supervising physician responsible for authorizing such prescriptions. (Id. at 13-14.) She argues that these statutes show Stock's "actual knowledge" and, therefore, "liability due to his legal duty as Defendant Van Sickle's supervising physician." (Id. at 13, 13 n.1.)

Here, Plaintiff has not sufficiently alleged facts to support supervisor liability under Bivens against any of the Warden Defendants, Beyer, or Stock.  While there can be no doubt that Plaintiff plausibly alleged that Phillips suffered from a sufficiently serious medical need – a diagnosed epileptic seizure disorder, she has not plausibly alleged that any of these Defendants acted with a sufficiently

---

[7] Plaintiff quotes Shadrick v. Hopkins Cty. Ky., 805 F.3d 724 (6th Cir. 2015), in support of her failure to train claims. (Id. at 19.)  The Shadrick court was assessing the propriety of summary judgment, not the sufficiency of pleadings.

culpable state of mind. Plaintiff alleges that the Warden Defendants are responsible for the day-to-day operations at LSCI Butner and its policies regarding medical treatment. Yet, even assuming she sufficiently alleged inadequate policies, she has not plausibly alleged how any of these Warden Defendants or Beyer, another Policymaking Defendant, had actual knowledge that any of these policies were allegedly deficient or that the policies were harming "high-risk inmates" like Phillips. There are no plausible allegations of "continued inaction in the face of documented widespread" problems that would have put these Defendants on notice. To the contrary, Plaintiff alleged that Holland, Andrews, Hollembaek, and Thomas Smith developed the Complex Supplement so that inmates could obtain medical treatment efficiently, securely, and effectively. Pursuant to these policies, medical screening with medical staff interviewing and assessing the inmate and reconciling his medications was to take place promptly on all new arrivals. The fact that the policy requires inmates without immediate medical needs to receive a physical examination within fourteen days of arrival cannot plausibly be read to imply that inmates with serious medical needs would not be expected to receive a physical examination more quickly.

As for the North Carolina statutes governing Van Sickle and Stock, Plaintiff cites no law that these statutes support an allegation that Stock had actual knowledge of a substantial risk to Phillips for purposes of an Eighth Amendment claim. This is understandable because even if it were reasonable to infer from the allegations that Stock did not give Van Sickle a written policy about prescribing

medications or a written policy about periodic reviews of the drugs being prescribed, these actions do not plausibly suggest responsibility under the Eighth Amendment. Even if Stock were statutorily responsible for Van Sickle's prescription of Divalproex, that was the one anti-epileptic medication that was prescribed. None of this plausibly alleges Stock's actual knowledge of a substantial risk to Phillips due to Van Sickle's conduct, nor do any other facts[8].

Similarly, Plaintiff has not plausibly alleged that any of the Policymaking Defendants who were allegedly responsible for training Perkinson had notice that she was violating inmates' constitutional rights and consciously chose not to remedy the situation with appropriate training. The same is true for Stock who was alleged to have failed to train Van Sickle. Moreover, it is not reasonable to infer from Plaintiff's allegations that "circumstances suggest that" any of these Defendants "had been exposed to information concerning" a "longstanding, pervasive, well-documented, or expressly noted" "substantial risk" such that any of them "must have known" about the "substantial risk" to Phillips, Farmer, 511 U.S. at 842-43. In sum, Plaintiff has not plausibly alleged "continued inaction" by any of these Defendants "in the face of documented widespread abuse", Slakan,

---

[8] In her response in opposition, Plaintiff included Stock among the Clinical Defendants. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 7-15.) To the extent that her opening general arguments about the Clinical Defendants' deliberate indifference apply to Stock, (see id. at 7-10), they are even more unpersuasive. Plaintiff argues these Clinical Defendants "came into contact with Mr. Phillips" and "were all privy to [his] records", (id. at 8), yet she never alleges these facts against Stock, (see Am. Compl. ¶¶ 31, 61), and it is not reasonable to infer them.

737 F.2d at 373, or that any of them were aware that subordinates were violating inmates' constitutional rights in the face of inadequate policies or training. Because Plaintiff's <u>Bivens</u> action is dismissed against Defendants for failure to state a violation of the Eighth Amendment, it is unnecessary to determine if qualified immunity protects these Defendants.

Anticipating the possibility that her allegations against the Warden Defendants may be insufficient, Plaintiff requests in her response in opposition to their motion "that, instead of dismissing these claims, Plaintiff be given leave to amend her complaint to remedy the deficiency." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 19.) A motion for leave to amend is required under these circumstances, because it does not appear the Warden Defendants consent to such amendment. <u>See</u> Fed. R. Civ. P. 15(a)(2). Rule 7(b) of the Federal Rules of Civil Procedure provides that "[a] request for a court order must be made by motion", and Local Rule 7.3(a) states that "[e]ach motion shall be set out in a separate pleading." Furthermore, Local Rule 15.1 requires the moving party to "attach the proposed amended pleading to the motion." Plaintiff has followed none of these procedures despite being represented by counsel who previously amended the complaint upon the action's removal to this Court. Instead, Plaintiff has tucked away her request in a lengthy response brief. As a result, the parties have not briefed the propriety of granting Plaintiff leave to amend as they necessarily would have done had Plaintiff properly sought leave to amend. Plaintiff's request is denied.

32

2.

Beyer, Rosenthall, DeNuzzia, Lane, and Hackett (collectively "Clinical Defendants") argue that Plaintiff has failed to state a claim of deliberate indifference against them. Beyer and Rosenthal contend that there are no facts alleging that their participation in Phillips's MLMR was deliberately indifferent to his serious medical needs or injured him. (Mem. of Law in Supp. of Mot. to Dismiss at 9-10.) Although Plaintiff alleges that DeNuzzia did have contact with Phillips prior to his death when she read his PPD test on May 18 and he requested his medications from her but did not receive them, DeNuzzia argues that Plaintiff fails to allege she knew of Phillips's medication regime or had the authority, responsibility, or ability to provide the medication to Phillips. (Id. at 10-11.) Lane, the pharmacy provider, contends that the allegation that "there is no record of why" Divalproex was not dispensed reveals that Plaintiff has no basis to assume that Lane was the reason why it was not dispensed. (Id. at 11.) She argues that Plaintiff also fails to allege that she read the alleged notation that Phillips was to receive Divalproex, knew the medication was not dispensed, knew of Phillips's medication regime, or would have been the one to dispense those medications. (Id. at 11-12.) Hackett argues that he is merely alleged to have participated in resuscitation efforts after Phillips's death, which contravenes a claim of deliberate indifference. (Id. at 12.)

Plaintiff responds[9] that the Clinical Defendants "came into contact with Mr. Phillips", they "were all privy to [his] records", and "one of the first things [a medical professional] does is review the patient's medical records." (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 7-8.)  She contends that she "specicifally pled" that "each" of the Clinical Defendants was "actually aware of Mr. Phillips's serious seizure disorder" when she alleged

> Each of the Defendants knew at the time of his or her acts and omissions that Mr. Phillips: (1) suffered from a serious medical condition – a severe seizure disorder; (b) required high, twice-daily doses of three different medications (Vimpat, Depakote, and Keppra), which were necessary to control his seizure disorder and prevent seizures; (c) would be at great risk of suffering from sudden tonic-clonic seizures if not given the medication; (d) had repeatedly requested the medications; (e) was feeling physically ill and experiencing declining health as a result of not receiving his medications; and (f) was at risk of death if he did not receive proper medication attention, including administration of his medications.

(Pl.'s Opp'n to Defs.' Mot. to Dismiss at 8, 9 (citing Am. Compl. ¶ 115).)  In addition, Plaintiff contends that the Clinical Defendants' knowledge can be inferred because Phillips's "condition was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the

---

[9] Plaintiff has requested oral argument in response to Defendants' motion to dismiss.  Because the parties have thoroughly briefed the issues and Plaintiff has not brought to the Court's attention special considerations she believes warrant oral argument, see L. Civ. R. 7.3(c)(1), oral argument is determined to be unnecessary.

risk and thus must have known about it". (Id. at 10 (quoting Parrish, 372 F.3d at 303).)

Specifically, Plaintiff argues that because Beyer was alleged to be "'responsible for all health care delivered at FCC Butner' including 'reviewing applications and credentials for membership to the medical staff, interviewing prospective physicians and mid-level providers, implementing and monitoring in-house Continuing Professional Education (CPE) training, maintaining the quality of health records, supervising Medical Officers, and evaluating patient care" that it is reasonable to infer that Beyer "had knowledge of Judge Conrad's recommendation", "was made aware of Mr. Phillips's presence at FCC Butner", and that she "oversaw and was directly involved in the assignment of inmates with serious medical needs to her staff." (Id. at 10-11 (quoting Am. Compl. ¶ 21).) Plaintiff also argues that Beyer's alleged[10] lack of awareness of Phillips's presence at LSCI Butner "alone" is "evidence of her failures as LSCI Clinical Director and her deliberate indifference to Mr. Phillips's serious seizure disorder." (Id. at 11-12.)

According to Plaintiff, because Rosenthal was Phillips's attending physician at FCC Butner, her lack of awareness of his presence and her failure to review his medical records support deliberate indifference. (Id. at 11.)

---

[10] Plaintiff describes this allegation as Beyer's argument. Although Beyer refers in her brief to her alleged lack of knowledge of Phillips's presence, it is Plaintiff who alleged this against Beyer in the first place. (See Am. Compl. ¶ 90.)

Plaintiff next asserts that because DeNuzzia read Phillips's PPD test that "it is reasonable to infer that [she] reviewed Mr. Phillips's medical records", "a cursory review of [which] would have revealed his serious and life-threatening seizure disorder." (Id. at 14.) Her alleged denial of Phillips's request for his medications "is clear deliberate indifference". (Id. at 15.)

Plaintiff contends that "[i]t is wholly reasonable to infer that [] Lane, as one of the registered nurses responsible for administering inmates' prescriptions, was aware of the warnings associated with stopping seizure medications abruptly." (Id. at 15.) Therefore, Lane's alleged failure to dispense Divalproex "deliberately and indifferently" ignored "the 'substantial risk of serious harm' to Mr. Phillips." (Id. at 15-16.)

Plaintiff "presume[s]" that Hackett, who is alleged to have initiated CPR on Phillips, was a nurse on Phillips's unit, "was thus involved in and aware of Mr. Phillips's clinical care during his four days there", and "would have accessed Mr. Phillips's medical records" revealing his seizure disorder. (Id. at 16.) Plaintiff also argues that it is reasonable to infer that Hackett was one of Phillips's "care providers" from whom Phillips requested, but was denied, his medication, demonstrating Hackett's deliberate indifference. (Id.)

As to Beyer, Rosenthal, DeNuzzia, and Hackett, Plaintiff has failed to state a claim of deliberate of indifference. As above, because she has not sufficiently alleged a constitutional violation, it is unnecessary to determine whether qualified immunity protects these Clinical Defendants. Most of Plaintiff's allegations and

arguments against Beyer sound in supervisor liability, as addressed above. (See, e.g., Am. Compl. ¶ 21 (alleging that as Clinical Director of LSCU Butner, Beyer is "responsible for clinical care provided there" and "provides clinical oversight and is responsible for all health care delivered at FCC Butner").) Beyer's participation in Phillips's MLMR is not alleged nor argued to have been deliberately indifferent. Furthermore, not only does Plaintiff allege that Beyer was not aware of Phillips's presence, (Am. Compl. ¶ 90), but it is not reasonable to infer from the broad fact that Beyer was allegedly responsible for all health care delivered at FCC Butner that she would have directly assigned Phillips to her staff. Even if it were reasonable to do so, such an inference does not sufficiently support Beyer's deliberate indifference towards Phillips. Furthermore, despite Plaintiff's argument, "that [Beyer] never saw or was even aware of Mr. Phillips during his incarceration" is insufficient, even coupled with the other allegations in which she is referenced and their reasonable inferences, to support a claim of deliberate indifference. The facts alleged do not paint a picture of Beyer comparable to that of the prison official in Brice v. Virginia Beach Correctional Center, 58 F.3d 101 (4th Cir. 1995) cited in Pl.'s Opp'n to Defs.' Mot. to Dismiss at 11, because no facts plausibly allege that, for example, she failed "to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist", Farmer, 511 U.S. at 843 n.8.

Similarly, Rosenthal's participation in Phillips's MLMR is not alleged to have been deliberately indifferent. And, like Plaintiff's argument against Beyer, "that

[Rosenthal] did not know [Phillips] was at the prison", (Am. Compl. ¶ 30), even coupled with other allegations in which she is referenced and their reasonable inferences, is insufficient to show that, for example, she, too, failed to confirm underlying facts or inferences of risk she strongly suspected to exist.

DeNuzzia's failure to give Phillips "his medications" that he requested of her when she read his PPD test at 6:46 a.m. on May 18 was also not deliberately indifferent, even if it is reasonable to infer that DeNuzzia reviewed Phillips's records that documented his serious seizure disorder. Also among the records was a prescription for Divalproex written around 3:25 p.m. on May 17. Although Phillips's MAR was blank at the time, there are no allegations from which it is reasonable to infer that DeNuzzia, a Registered Nurse present at 6:46 a.m. to read Phillips's PPD test, had knowledge that the prescription written the previous afternoon would not be filled or that the medication would not be dispensed. Likewise there are no allegations that she strongly suspected as much but failed to investigate. In sum, Plaintiff has not plausibly alleged that DeNuzzia was actually aware of the substantial risk to Phillips when she denied his request for his medications.

Hackett is merely alleged to be a Registered Nurse employed at FCC Butner who, along with Perkinson and Bunn, initiated CPR, conduct which is not alleged to have been deliberately indifferent. Despite Plaintiff's arguments, it is not reasonable to infer from these very limited allegations any of what Plaintiff proposes: that Hackett must have been a nurse working on Granville B, the unit to

which Phillips was assigned (which is not alleged in the Amended Complaint), that Hackett would have accessed Phillips's records during his incarceration prior to this death, or that Hackett was among the unnamed medical staff who denied Phillips's requests for medications.

On the other hand, Plaintiff has stated a claim of deliberate indifference against Lane. Lane, a Registered Nurse, is alleged to have been "the pharmacy provider" during Phillips's incarceration at LSCI Butner. Although Van Sickle prescribed Divalproex for Phillips on May 17, that prescription was never filled or dispensed. On May 18, "a notation" "indicated Mr. Phillips was to receive Divalproex", but Lane allegedly "did not issue that medication to Mr. Phillips" nor is there a record of why the medication was not dispensed as ordered. It is reasonable to infer that, as both a Registered Nurse and the pharmacy provider, Lane would have been aware of the BOP formulary for Divalproex and the dangers posed to inmates suffering from epileptic seizure disorders when they do not receive their anti-epileptic medications. Accordingly, Plaintiff has sufficiently alleged that Lane's failure to fill and dispense the Divalproex prescription was deliberately indifferent to Phillips's serious medical needs. See Smith, 589 F.3d at 738-39 (identifying a prison official's intentional interference with prescribed treatment as among the ways in which deliberate indifference can manifest) (quoting Estelle v. Gamble, 429 U.S. 91 (1976)). And, because Phillips's right to have a prison official not intentionally interfere with his prescribed treatment has

been clearly established for decades, see Estelle, 429 U.S. at 104-05, qualified immunity does not protect Lane at this stage of the litigation.

3.

Although Plaintiff's request for leave to amend as to the Warden Defendants has been denied under these circumstances and she asks that Defendants' motion to dismiss be denied without prejudice to their reasserting the same arguments after discovery, the motion to dismiss is granted without prejudice in part as to Holland, Revell, Andrews, Hollembaek, Thomas Smith, Donna Smith, Swain, Beyer, Rosenthal, Stock, DeNuzzia, and Hackett. The motion is denied in part as to Lane.

C.

Perkinson separately moves to dismiss on the basis of qualified immunity and argues that Plaintiff has failed to plead sufficiently that Perkinson "knowingly violated a constitutional right, what those rights might have been to determine if they were clearly established at the time of the incidents, or . . . that [Perkinson] knew and understood that her respective conduct was violating a constitutional right." (Perkinson's Br. in Supp. of Mot. to Dismiss at 5-6 [Doc. #71].) She relies almost entirely on Quintana v. Santa Fe County Board of Commissioners, No. CIV 18-0043 JB/LF, 2019 WL 452755 (D.N.M. Feb. 5, 2019), an unpublished district court case whose appeal is pending before the Tenth Circuit Court of Appeals, because of the factual similarities. (See Perkinson's Br. in Supp. of Mot. to Dismiss at 7-14.)

Plaintiff responds that she has sufficiently alleged that Perkinson violated Phillips's Eighth Amendment right, that right was clearly established at the time, and any reasonable officer would have known her conduct was unconstitutional. (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 5-18 [Doc. #76].)  More specifically, Plaintiff advances the same arguments as she did in response to the Clinical Defendants' motion to dismiss.  She argues that she "specifically pled" that

> Each of the Defendants knew at the time of his or her acts and omissions that Mr. Phillips: (1) suffered from a serious medical condition – a severe seizure disorder; (b) required high, twice-daily doses of three different medications (Vimpat, Depakote, and Keppra), which were necessary to control his seizure disorder and prevent seizures; (c) would be at great risk of suffering from sudden tonic-clonic seizures if not given the medication; (d) had repeatedly requested the medications; (e) was feeling physically ill and experiencing declining health as a result of not receiving his medications; and (f) was at risk of death if he did not receive proper medication attention, including administration of his medications.

(Id. at 17 (quoting Am. Compl. ¶ 115).)  Likewise, she contends that Perkinson's knowledge can be inferred because Phillips's "condition was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it". (Id.)  And, yet, "[d]espite this knowledge, Defendant Perkinson did not provide Mr. Phillips with medical attention or with the prescribed medications necessary to control his condition." (Id.)

Plaintiff's allegations against Perkinson do not state a claim of deliberate indifference.  It is alleged that Phillips's "medication orders record"

was provided to FCC Butner when he transferred there from the Mecklenburg County Jail, and Perkinson was the first health care provider to see Phillips upon his arrival at LSCI Butner. At 3:41 p.m., Perkinson performed a health screen, during which she noted his seizure disorder but not that he was taking medication for those seizures. Phillips was scheduled to have a medication reconciliation with a physician at 3:50 p.m., less than ten minutes after Perkinson performed her screening. Even inferring that Perkinson was privy to Phillips's medication orders record provided to FCC Butner, her alleged failure to note any medications on the health screen and "flag or otherwise elevate Mr. Phillips's medical care for his serious condition" do not constitute deliberate indifference. Plaintiff has not plausibly alleged that Perkinson was aware that she created a substantial risk to Phillips's serious medical needs when he was scheduled for a medication reconciliation with a physician less than ten minutes after Perkinson assessed him. Although that medication reconciliation with a physician did not happen, there are no allegations that plausibly suggest that Perkinson was aware or suspected that a physician may not conduct Phillips's medication reconciliation shortly after she assessed him. And, her participation in CPR efforts is not alleged to have been deliberately indifferent. To the extent that Plaintiff relies on the fact that Perkinson wrote a memorandum on June 17 that tells a story different from that reflected in Phillips's medical records, neither the writing of the

memorandum nor its presentation of facts supports deliberate indifference. Therefore, because Plaintiff has not sufficiently stated an Eighth Amendment claim against Perkinson, it is unnecessary to determine if qualified immunity shields her from liability.

Plaintiff does not specifically request leave to amend her allegations against Perkinson, but she does contend as part of her general pleading law that leave to amend should be permitted. (See id. at 5.)  Even if this were considered a request for leave to amend, for the reasons explained above, the request is denied.  Nevertheless, and although Plaintiff asks that Perkinson's motion be denied without prejudice to her raising the same arguments after discovery, Perkinson's motion is granted without prejudice.

III.

Plaintiff has moved to strike the portion of Sandhu's and Vanceboro Internal Medicine, P.A.'s Answer in which they assert motions to dismiss. In their Answer, Sandhu and Vanceboro Internal Medicine, P.A. ("Vanceboro") (collectively "Defendants" for purposes of this section) assert a "FIRST DEFENSE AND MOTIONS TO DISMISS" in which they

> move this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for a dismissal of all claims asserted by Plaintiff on the grounds that Defendant Sandhu was not involved in the care of Mr. Phillips until Mr. Phillips coded on May 20, 2017 and Defendant [Vanceboro] was never involved in the care of Mr. Phillips.

(Answer & Mots. to Dismiss at 2 [Doc. #14].)  In part, Plaintiff argues that Rule 12(b) of the Federal Rules of Civil Procedure requires that a Rule

12(b)(6) defense asserted by motion be made before the answer is filed, while Sandhu and Vanceboro filed their motion at the same time as their Answer. (Mem. in Supp. of Pl.'s Mot. to Strike at 2 [Doc. #62].) Therefore, Plaintiff seeks to strike the motion, but not the defense itself[11]. (Id.) Next, Plaintiff argues that Defendants' purported motion fails to comply with Local Rule 7.3(a) requiring each motion to "be set out in a separate pleading" and "accompanied by a brief". (Id. at 3.) Furthermore, the "conclusory and opaque 'motion to dismiss' wholly fails to put the Plaintiff on notice of the grounds on which [Defendants] are moving" and neither Plaintiff nor Defendants have treated the "alleged 'motion' as live." (Id. at 3, 5.) Accordingly, Plaintiff argues that an appropriate sanction, per Local Rule 7.3(k) is to strike the portion of Defendants' Answer "that purports to move the Court for dismissal of Plaintiff's claims." (Id. at 3-4.)

In response, Defendants "withdr[ew] their First Defense and Motions to Dismiss filed as part of their Answer", (Notice of Withdrawal of Defs.' First Def. and Mots. to Dismiss at 2 [Doc. #72]), and asked that Plaintiff's

---

[11] Plaintiff notes that "Defendants appear to have preserved it as a defense under Fed. R. 12(h)(1)(B)(ii)." (Mem. in Supp. of Pl.'s Mot. to Strike at 2.) However, Rule 12(h)(1)(B)((ii) explains that "[a] party waives any defense listed in Rule 12(b)(2)-(5) by: . . . failing to . . . include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." (Emphasis added.) The more relevant section of Rule 12 is Rule 12(h)(2)(A) which provides that "Failure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a)".

motion be denied as moot, (Defs.' Resp. in Opp'n to Pl.'s Mot. to Strike at 2 [Doc. #73]).

Because Defendants have already withdrawn their First Defense and Motions to Dismiss filed as part of their Answer, there is no need to strike those portions of the Answer. Plaintiff's motion is denied as moot.

IV.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that

1) Defendant Michael Van Sickle's Motion to Dismiss [Doc. #24] as converted to a motion for summary judgment is GRANTED;

2) Defendants Henry McMillan's, Ivy Manning's, Kellie Harden's, Christy Bunn's, and Alnissa Shaw's Motion to Dismiss [Doc. #64] as converted to a motion for summary judgment is GRANTED;

3) Defendants James C. Holland's, Sara M. Revell's, Justin F. Andrews', Stephanie L. Hollembaek's, Thomas B. Smith's, Donna M. Smith's, Cynthia Swain's, Sara Beyer's, Amy Jo Rosenthal's, Andrew E. Stock's, Mary J. DeNuzzia's, Yvonne Lane's, and Joseph Lee Hackett's Motion to Dismiss [Doc. #66] is GRANTED IN PART WITHOUT PREJUDICE as to Holland, Revell, Andrews, Hollembaek, Thomas Smith, Donna Smith, Swain, Beyer, Rosenthal, Stock, DeNuzzia, and Hackett and is DENIED IN PART as to Lane;

4) Defendant Terri Perkinson's Motion to Dismiss [Doc. #70] is

   GRANTED WITHOUT PREJUDICE;

5) The United States of America's Motion to Substitute [Doc. #29] and

   Motion to Dismiss [Doc. #30] are DENIED AS MOOT; and

6) Plaintiff Robin Denise Phillips's Motion to Strike Portions of

   Defendants Sandhu and Vanceboro's Answer [Doc. #61] is DENIED

   AS MOOT.

   This the 10th day of January, 2020.


                                        /s/ N. Carlton Tilley, Jr.
                                   Senior United States District Judge